United States Court of Appeals,

Eleventh Circuit.

No. 95-9135.

Melba J. BURRELL, Plaintiff-Appellant,

v.

The BOARD OF TRUSTEES OF GEORGIA MILITARY COLLEGE, et al., Defendants,

Alva L. Baggarly, Individually and in his official capacity as Chief Executive Officer of First Federal Savings and Loan Association of Milledgeville, First Federal Savings and Loan Association of Milledgeville, Defendants-Appellees.

Oct. 24, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 5:88-CV-169-4(DF), Duross Fitzpatrick, Judge.

Before EDMONDSON and BLACK, Circuit Judges, and HILL, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Plaintiff brought suit against Defendants under Title VII for gender discrimination and retaliation. The case was one involving an employment decision—Plaintiff's dismissal—which was the product of mixed motives on the employer's part. The district court conducted a bench trial and entered judgment for Defendants. We affirm.

*Background*

Plaintiff Melva J. Burrell ("Plaintiff") began working in Milledgeville, Georgia for First Federal Savings and Loan of Milledgeville ("First Federal") as a teller in 1972. In her 16 years there, she advanced rapidly to higher positions. In 1986, she was appointed senior vice president. Plaintiff also served as corporate secretary and was appointed to the Board of Directors.

For the first six months of 1987, Plaintiff acted as the interim Chief Executive Officer ("CEO") and was on the search committee for a new CEO.[1] Plaintiff recommended Alva Baggarly to the Board for the CEO position, and they voted to hire him. Baggarly started as CEO of First Federal in July 1987.

---

[1]Although the Board encouraged her to apply for the CEO position herself, she declined.

Baggarly and Plaintiff met to discuss the company's organization. They disagreed over how First Federal should be structured and what Plaintiff's responsibility would be. Baggarly disclosed his intent to establish an executive vice president position that would fall directly below the CEO. When Plaintiff expressed interest in the position, she claims that Baggarly told her that he planned to hire a male because too many women filled First Federal's officer positions. Baggarly never admitted or denied making this statement, but he repeatedly denied that he ever discriminated against Plaintiff based on her gender.

In the following months, Plaintiff and Baggarly had constant disputes.[2] The tension between Baggarly and Plaintiff was visible to First Federal's employees, who felt that they had to choose sides. Board members eventually became aware of the problem; Plaintiff met with some of them to discuss her conflicts with Baggarly, particularly her concern over loan-policy violations.

Baggarly began to isolate Plaintiff from his management scheme. In the fall of 1987, Baggarly hired Larry Smith as an officer to manage real estate lending. Baggarly introduced Smith to other board members, but not to Plaintiff. Baggarly, Smith and Fred Williamson, another male loan officer, met each morning to discuss loan matters; but in spite of her position as chief financial officer, Plaintiff was not included in the meetings. In early 1988, Baggarly began to have business development parties for local realtors; but he invited only the other male employees and Board members. Plaintiff at this time confided to a close friend that Plaintiff thought that she was being discriminated against because she was a woman.

During this same period, Plaintiff was also serving as president of the Baldwin County PTA. She publicly criticized Georgia Military College ("GMC") at PTA meetings and Board of Education meetings for what Plaintiff believed were GMC's segregationist practices. She also advanced the

---

[2]For example, they argued over whether Baggarly could hire officers without Plaintiff having an opportunity to interview them and without following Board policy requiring prior Board approval of new officer positions. They disagreed over employee personnel files, employee loans, and equipment and supply purchases. Plaintiff repeatedly accused Baggarly of violating Board policy and of ethical deficiencies in some of his interest-charging and changing of payment due dates (what she called a "bait and switch").

position that GMC should receive no public funding in the light of these practices. Jacob Goldstein, one of the seven members of First Federal's Board of Directors and also a member of the Board of Trustees of GMC, frequently debated his opposing views of GMC with Plaintiff.

In Spring 1988, Plaintiff wrote a letter to the editor of the local newspaper. The *Milledgeville Union Recorder* published the letter to the editor, which criticized public funding of GMC. A reporter from the *Atlanta Journal and Constitution* called to interview Plaintiff on the subject. In preparation for this interview, Plaintiff inquired into the racial composition of GMC's faculty; she was informed that there were no black faculty members. This information and other statements provided by Plaintiff were printed in an *Atlanta Journal* article.

In response to Plaintiff's public criticism of GMC, Goldstein's brother withdrew his funds from First Federal. Other GMC advocates threatened to do the same. Baggarly asked an employee to notify him of account closings because of the GMC situation and further asked that instances of Plaintiff's poor performance be documented.

Over the next weeks, Baggarly spoke with several Board members about his conflicts with Plaintiff. Plaintiff and Baggarly agreed to submit their differences to the Board at the next meeting. At this meeting, Plaintiff and Baggarly each addressed the Board individually. Plaintiff's most pressing complaint was that Baggarly repeatedly and consistently failed to follow Board policy; she cited many examples to that effect. Plaintiff also complained that she had requested that Baggarly define her duties and that he had not responded. Plaintiff also mentioned complaints of sexual harassment at one of the branches.[3]

In his presentation, Baggarly described what he viewed as "personality conflict" and "style of management" problems. He also responded to Plaintiff's allegations of board-policy violations. The Board conferred for a short time and unanimously adopted a resolution supporting Baggarly's

---

[3]Plaintiff contends that she also mentioned that she felt that she was being discriminated against on the basis of her gender. No Board member recalls her mentioning this topic. One Board member's notes from the meeting show an entry of "sex disc." It is not clear, and the district court did not specifically resolve, whether this phrase referred to sex discrimination at First Federal's other branches or referred to Plaintiff's own claim of gender discrimination.

3

right to make employment decisions without the Board's prior consent. Baggarly then requested that Plaintiff resign, but she refused. He fired her the next day.[4]

The Board paid Plaintiff to relinquish her seat on the Board, but she received no severance pay. Baggarly hired John Collins to replace Plaintiff at a salary $7000 higher than what Plaintiff had been making, although neither had college degrees.

Plaintiff sued under Title VII for sex discrimination and retaliatory discharge.[5] Following a bench trial, the district court found for First Federal on both Title VII claims. Plaintiff appealed.

I. *Gender Discrimination Claim*

Plaintiff testified that when she asked Baggarly—about a year before she was fired—to give her the executive vice president job, he responded that he wanted to hire a man for the position because too many women filled First Federal's officer positions. She says the statement constitutes direct evidence of gender discrimination. Assuming for the sake of argument that Baggarly did, in fact, make the statement,[6] it is not direct evidence of gender discrimination in Plaintiff's *termination.*

Direct evidence is "evidence, which if believed, proves existence of fact in issue without inference or presumption." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 n. 6 (11th Cir.1987) (citing Black's Law Dictionary 413 (5th ed.1979)). Here, we cannot say that Baggarly's statement—even if fully credited—*proves* the existence of a discriminatory motive in his decision

---

[4]Before Plaintiff was actually fired, students and teachers at GMC heard that Plaintiff had been fired and celebrated.

[5]Plaintiff also brought claims under section 1983 and section 1985, alleging that certain officials from GMC, a public institution, conspired with First Federal officers to have her fired in retaliation for her constitutionally protected speech. On a previous appeal from the denial of the government's motion for summary judgment, we dispensed with all but the Title VII claims. We held that Plaintiff had adduced insufficient evidence of a conspiracy between First Federal and government officials to support the section 1983 and section 1985 claims. *See Burrell v. Bd. of Trustees of Ga. Military College,* 970 F.2d 785 (11th Cir.1992).

[6]Baggarly has neither admitted nor denied making this statement.

4

to terminate Plaintiff's employment; at best, the evidence *suggests*—but does not prove—a

discriminatory motive.[7] "By definition, then, it is circumstantial evidence." *Id.*[8]

---

[7]The evidence in this case is distinguishable from other cases in which this court has found direct evidence of discrimination. In *Caban-Wheeler v. Elsea,* 71 F.3d 837, 842-43 (11th Cir.1996), for example, this court found that a statement by a black decisionmaker to a white employee that the decisionmaker wanted a black person to have the white employee's job constituted direct evidence that the white employee was terminated for racially discriminatory reasons. Unlike the comments in *Caban-Wheeler,* however, the statements made here by Baggarly—the male decisionmaker—do not specifically address nor were they made in the context of Plaintiff retaining her job with First Federal. The context was a different one: Baggarly's decision not to promote Plaintiff to the executive vice president position. Inferences would still have to be drawn by the factfinder that Baggarly's unwillingness to promote a female to the second-highest office in management meant that he also intended to later terminate female employees because they were female. No such inferences needed to be drawn in *Caban-Wheeler,* where the decisionmaker's alleged comments addressed the specific job from which the white employee was terminated.

*Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928 (11th Cir.1995), is distinguishable for the same reason. In *Haynes,* the male decisionmaker allegedly stated that women were simply not tough enough to do the job from which the plaintiff had been removed and suggested to a third party that it would take a man to do the job from which the plaintiff was removed. The court found these comments to be direct evidence of gender discrimination. *Id.* at 930. As in *Caban-Wheeler,* the statements related directly to the adverse employment action for which the plaintiff was suing. The nexus between the discriminatory statements and the adverse employment action, therefore, was much closer than the nexus here. For *Caban-Wheeler* or *Haynes* to be more like our case, the plaintiffs in those cases would have had to try to use the proffered statements by decisionmakers as direct evidence for some employment action not tied to the position and job action about which the comments were made.

*EEOC v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir., 1990), is different than our case in another way. There, we held that general racially discriminatory statements made by two decisionmakers constituted direct evidence of those decisionmakers' failure to promote black employees for discriminatory reasons. *Id.* at 924. One decisionmaker had allegedly said that, if it were his company, he would hire no black people; the other allegedly told a black employee that "you people can't do a thing right." We rejected the defendant's argument that because one statement referred to hiring, not promoting—which was the challenged employment action—and the other did not refer to the employment process at all, these statements were not direct evidence. This court wrote: "The statements indicate a decidedly negative attitude toward black people on the part of the two people responsible for promotions. There is *no reason* to think that those attitudes differ from hiring to promotion." *Id.* at 924 n. 6 (emphasis added).

When employers (like the decisionmakers in *Alton*), without concern for particulars, make broad, derogatory statements about a gender or a race and, thus, demonstrate a general discriminatory animus toward that protected group, the scope of that evidence can be as broad as the broad statements. These statements—because of their breadth—may obviate the need for inferences about the speaker's motivation for a wide category of employment decisions, including hiring and promoting practices. In

Whether the plaintiff—by means of circumstantial or direct evidence or both—has carried the burden to show discrimination is a question of fact, which will only be overturned by this court if clearly erroneous. *Lake v. B.F. Goodrich Co.,* 837 F.2d 449, 451 (11th Cir.1988). "Findings based on the credibility of witnesses demand even greater deference to the trial court's findings;  for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Caban-Wheeler v. Elsea,* 71 F.3d 837, 843 (11th Cir.1996) (internal quotation marks omitted).  And "[w]hen there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (citation omitted).

Here, the district court, after conducting a complete trial and hearing extensive testimony from the parties involved, found that the evidence (including the testimony on Baggarly's statement about promoting plaintiff) failed to prove—on the pertinent termination issue—gender discrimination at all.[9]  The court wrote:  "The court cannot say that Plaintiff has proved that her

contrast, when the employer—as in our case—makes a specific comment in relation to a specific job or promotion, we believe that the value of that comment as direct evidence is limited to a challenge to that specific job or employment decision.  Still, a comment, which was narrowly tailored to a particular event, might constitute some evidence of discrimination for a case based on a separate event;  the statement, however, must then be seen *not* as direct evidence of discrimination, but as circumstantial evidence of discrimination.  So—unlike *Alton Packaging*'s broad-sweeping statements—the specific comment about a high promotion is circumstantial evidence in this employment termination case:  because the comment is not tied closely enough to the challenged employment action, some reason does exist to think that an employer might have one attitude about a promotion to a specific high job and might have an unrelated attitude about a later termination from a different job.

[8]Even if we concluded that Plaintiff's evidence was direct evidence, the result in this case would be the same.  The burden of persuasion does not automatically shift to the defendant upon the plaintiff's presentation of direct evidence.  For the burden of persuasion to shift, the plaintiff must present direct evidence of the discrimination *and* the factfinder must believe the direct evidence;  put differently, plaintiff must show that discrimination was *a* substantial motive for the employer's action.  *Haynes,* 52 F.3d at 931.  Otherwise, the burden of persuasion does not shift to the defendant.  Here, the district court found that Plaintiff never met her burden to show that gender was a factor at all in her termination.

[9]Despite Plaintiff's contentions to the contrary, the district court did not fail to make credibility determinations about Plaintiff's evidence.  The district court discussed it specifically:

6

gender was a factor in Baggarly's decision to discharge her."  Based on the sum of the evidence, this finding was certainly a permissible view of the evidence;  it is not, therefore, clearly erroneous.

II. *Retaliation Claim*

Plaintiff also contends that her discharge from First Federal was in retaliation for her public criticism of GMC's discriminatory employment practices.  By a preponderance of the evidence, Plaintiff convinced the factfinder (here, the district court judge) that "her criticism of GMC was a factor in the decisionmaking process to terminate her";[10]  in accordance with *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the district court then shifted the burden of persuasion to First Federal to prove that it would have fired her even in the absence of her

> Plaintiff has urged the court to view Plaintiff's testimony that Baggarly told her he did not wish to consider a female for the position of executive vice president as direct evidence of discrimination.  Plaintiff argues that Baggarly never specifically rebutted or denied making such a statement and the testimony by Plaintiff is therefore proved as fact. *The court declines to give this testimony the same weight as if Baggarly had admitted making the statement.*  It considers the statement unrefuted but not admitted. *The court will assign the testimony the weight and credibility it deems proper, viewing the testimony as that of an interested party.*

> (emphasis added).  Although the district court did not designate the specific weight it assigned the evidence, it did acknowledge the evidence.  The court also indicated, however, that it *did not* consider the evidence to be proved as fact or admitted.  That Plaintiff was an interested party would also weigh in the equation.  The district court's ultimate determination on the evidence, including Baggarly's supposed statement made almost a year before Plaintiff was fired, is evident from the remainder of the opinion: "The court cannot say that Plaintiff has proved that her gender was a factor in Baggarly's decision to discharge her."

[10]In so deciding, the district court accepted the argument that Plaintiff's opposition to GMC's supposed discriminatory hiring practices satisfied the "engaged in statutorily protected conduct" element.  First Federal argued at the district court level that, for the purposes of a prima facie case of retaliation, the employee must oppose *its own employer's* supposed discriminatory practices, not simply any employer's.  The district court rejected First Federal's position, reasoning that because the Board of Directors for First Federal and GMC had one interlocking member (Jacob Goldstein), a sufficient nexus was shown to allow Plaintiff's criticisms of GMC to constitute statutorily protected conduct.

> We question the district court's decision to extend *Bailey v. USX Corp.,* 850 F.2d 1506 (11th Cir.1988) (allowing former employee to sue for retaliation under Title VII), to allow Title VII to reach alleged retaliation by the employer for its employees' statements in a public controversy about GMC. We, however, do not reach this issue.  No party has raised the issue on appeal, and the judgment is due to be affirmed without considering it.

criticism of GMC.[11] *Price Waterhouse* provides specific guidance on how the employer must meet this burden:

> [T]he employer should be able to present some objective evidence as to its probable decision in the absence of an impermissible motive ... An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision *if that decision did not motivate it at the time of the decision.* Finally, an employer may not meet its burden in such a case by merely showing that at the time of the decision it was motivated only in part by a legitimate reason ... The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision.

*Id.* at 250-53, 109 S.Ct. at 1791-92 (emphasis added).

Plaintiff contests the district court's determination that First Federal met its burden, arguing that the district court misapplied *Price Waterhouse* in two ways: (1) the court did not understand that the defendant's legitimate reason had to be able to stand alone—in other words, that it had to be a reason for which she would have been fired in the *absence* of any illegal motive and (2) the court did not understand that the legitimate reason had to be able to stand alone *at the time of the firing.*

As support for her contention that the district court did not understand that the legitimate reason had to stand on its own, Plaintiff points out the district court's statement that "many motivations did indeed coalesce on the date the Board adopted a resolution granting Baggarly the authority to fire Plaintiff" and that "a merger of motives, illegitimate and legitimate, requires a finding for the Defendant."

While the district court's language in this case might at times have been more clear, a district court, writing after a bench trial, is not required to use "magic words" or to write with such precision that no trained legal mind could find an ambiguity. "Trial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona,* 497 U.S. 639, 653, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). When a trial judge tries a case without a jury, the judge is presumed to

---

[11]As the district court noted, in a mixed motives case premised on employment decisions occurring before November 1991—as this case is—a defendant may escape liability entirely by proving by a preponderance of the evidence that it would have made the same decision if it had not allowed the illegitimate motive to play a role in the employment decision.

have discharged his official responsibilities properly. *Ferrari v. United States,* 169 F.2d 353, 355 (9th Cir.1948). Only if no reasonable construction of what the district court wrote can support a lawful judgment, will we find error. And, we note that in this case it is highly unlikely that the district court—which cited *Price Waterhouse*—would misapprehend that the legitimate reason had to stand on its own, as this point is the crux of a mixed-motive analysis. We understand the opinion's words stressed by Plaintiff to be no more than the district court's observation that the court was facing and deciding a mixed-motives case: Plaintiff's termination was the product of a mixture of legitimate and illegitimate motives.

That the district court knew the law is borne out here by the remainder of the opinion. The opinion, when viewed in its entirety, makes clear enough that the district court did find that First Federal relied on a legitimate decisive motivation—that is, a reason which, by itself, would have caused her dismissal—for firing Plaintiff: the personality clashes and management conflicts. For example, the district court said,

> The Board is the body who tacitly made the decision to discharge plaintiff by adopting the resolution that shifted the decision to Baggarly. *It did so because it needed to remedy the discord with in its management.* The bottom line is that the two disagree at virtually every turn, and as the lowest ranking official, Plaintiff lost.

> \* \* \* \* \* \*

> Although the Board may have had an intent to retaliate against Plaintiff, the court has already determined that *other considerations were driving the Board's decision.* This court cannot help but feel that her letters to various papers was [sic.] a compelling factor, nevertheless, it still believes her termination would have occurred for all the reasons previously mentioned.

The driving considerations for an act are those that cause the act. *See generally The Random House Dictionary* (2d Ed.1987) (defining "drive" as "to cause to move," "an inner urge that stimulates activity or inhibition" and "to force to work or act.") So, when read in its entirety and in favor of the judgment, the district court's opinion adequately demonstrates that it understood the necessity that the employer's legitimate reasons, standing alone, would have caused the employer to make the same decision.

9

In support of Plaintiff's position that the district court was unaware that the employer's legitimate motive had to be the one operating at the time she was fired, Plaintiff cites to the district court's statement that First Federal had proven that the difference between Plaintiff and Baggarly was such that it would "ultimately culminate in the termination of one." Plaintiff reads the word "ultimately" to indicate that the district court made no finding as to whether the Plaintiff/Baggarly conflicts were the decisive reason motivating First Federal at the time of Plaintiff's firing; she stresses that a finding that she would have been fired at some point in the future is not sufficient under *Price Waterhouse.*

Again, the district court's complete thought must be reviewed in context, bearing in mind our presumption that the district court knows and correctly applies the relevant law:

> Defendant has convinced the court that the personality and management controversy between Baggarly and Plaintiff ran too deep to believe it would not ultimately culminate in the termination of one. *As the person second in command, Plaintiff suffered the adverse consequences.*

(emphasis added).

Especially when read in a light favorable to the judgment, the district court's full statement supports its determination that First Federal met its *Price Waterhouse* burden. The district court found that the conflicts between Plaintiff and Baggarly would, in the end, cause the employment of one of them to be terminated. Then the court notes that the end came, in fact, on the day of the Board meeting.

The judgment of the district court is AFFIRMED.

10