**Frank MORA, Plaintiff,**

v.

**UNIVERSITY OF MIAMI, Defendant.**

No. 96–1664–CIV.

United States District Court,
S.D. Florida.

July 14, 1998.

Leslie Holland, Miami, FL, for Plaintiff.

Eric D. Isicoff, Isicoff & Ragatz, P.A., Miami, FL, for Defendant.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

GOLD, District Judge.

THIS CAUSE came before the Court upon defendant University of Miami's ("University") Motion for Summary Judgment [D.E. # 32]. Plaintiff Frank Mora brings this discrimination action against the University under Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq.* Mora asserts a claim for national origin (Columbian) discrimination based upon the University's alleged "termination" of plaintiff, and for retaliation, predicated on alleged disparate treatment of plaintiff after he lodged complaints with the University regarding the conduct underlying his discrimination claim. After careful consideration of the parties' arguments, the relevant case law and the record as a whole, this Court concludes that defendant's motion for summary judgment should be granted.

### I. Findings of Fact and Procedural Background

On August 11, 1983, the University hired Mora as a full time mechanic in the Zone Equipment Maintenance Department. After a temporary layoff, the University transferred Mora to the University's Physical Plant Department in the same position, working the 4:00 p.m. to 12:00 a.m. shift. Leon Lipson acted as Mora's supervisor, although there were no supervisors on duty during Mora's shift.

On August 5, 1985, Mora had periodontal surgery and, yet, he was able to report to work the four days following the surgery. Mora then took ten days of sick time. Lipson made several unsuccessful attempts to reach plaintiff at his home to determine when Mora anticipated returning to work. (Zanyk Aff. ¶ 7, Ex. A, B). Eventually Lipson reached Mora who explained that he would return as soon as his doctor cleared him for duty. Lipson then contacted Mora's dentist to find out when to expect Mora to return to work. Dr. Hoffman explained that each surgery required one day of recovery and that

plaintiff's last surgery had been on August 5, 1985.

Lipson then called Mora and explained that Dr. Hoffman would not substantiate his medical excuses. Mora told Lipson that he would call him back. Dr. Hoffman then called Lipson. Dr. Hoffman told Lipson that plaintiff had been taking pain killers and although there was no medical reason for his pain, plaintiff should not return to work under the influence of pain killers. In response to Lipson's dogged inquiries plaintiff filed a grievance against Lipson for harassment. In a letter dated September 9, 1985, Lipson told plaintiff that he would receive sick pay for his absences. Lipson warned plaintiff, however, that he would have to substantiate any future absences due to sickness with a note from his doctor. In closing, Lipson asserted that Mora's harassment claim was unfounded.

On September 18, 1985, and October 1, 1985, the University issued a memorandum to all maintenance personnel, instructing them to drive their vehicles on paved surfaces only. On February 6, 1986, Mora was seen driving across the University lawn. Lipson issued a written warning to Mora, who, in turn, filed a grievance, claiming that the University had never informed him of this policy. The University resolved Mora's grievance by removing the incident report from his file and instructing his supervisors to counsel him verbally.

On July 29, 1987, Mora agreed to take the shift of a co-worker Manny Figueroa. Figueroa worked the day shift, and Mora regularly worked the second shift. After substituting for Figueroa during the day as promised, Mora left University grounds without finding coverage for his own shift, or notifying anyone of his intent to leave. Lipson filed a written disciplinary complaint against Mora for his failure to perform his duties.

On October 2, 1987, the University transferred Mora and others to various departments throughout the University. Mora's new position was in Residence Halls where he was responsible for responding to emergency calls, maintaining work logs and working with security. Jack Sargent was plaintiff's new supervisor. On March 9, 1989, Mora received a written warning for overreacting to a student employee's complaint. The student employee had complained unjustifiably that Mora had not handled an emergency problem with the elevator. Sargent filed a disciplinary complaint against Mora and, in response, Mora filed a grievance against Sargent. The University dismissed the grievance against Sargent and issued a verbal warning to plaintiff.

On July 6, 1989, the University promoted plaintiff to Mechanic III. Mr. Mora's new supervisor was Frank Perez. In contrast to plaintiff's previous supervisors, Mr. Perez testified that Mora never demonstrated any attitude problems or other work-related lapses. Although Perez did not work closely with Mr. Mora, as their shifts only overlapped for a short period each day, Perez rated plaintiff as satisfactory or higher over nearly a three-year period.

On June 9, 1992, the University transferred Mora from Residence Hall to Plant Facilities. Mr. Mora's new supervisor was Alan Rose. Despite the University policy requiring employees to furnish the University with a contact number for emergency situations, Mr. Mora refused to comply with this directive.[1] In a memorandum dated September 1, 1993, Kevin Clements, the Physical Plant Energy Monitor, documented Mora's evasiveness in this regard. Clements asked Mora for his phone number and Mora replied: "I don't have a phone, uhh ... my phone isn't working, uhh ... I'm calling from a neighbor's house." In a memorandum from Alan M. Weber, Acting Director of Housing Maintenance to plaintiff, dated October 11, 1993, Mr. Weber documents that he had two conferences with plaintiff "to clarify issues, discuss discipline, and answer your questions concerning discrimination contention." Mr. Weber informed plaintiff that if Mora persisted in refusing to provide University with a number, defendant would transfer plaintiff to the day shift.

---

1.  Mora contends that he obtained a private number after receiving harassing phone calls at home from Rose.

On September 12, 1993, a plumbing emergency arose during plaintiff's shift. The department made several unsuccessful attempts to contact plaintiff. Unable to reach plaintiff, the University called a standby plumber to handle the problem at considerable expense. Plaintiff claims that health problems prevented him from carrying a radio. On January 14, 1994, Clements asked Mora to investigate a flooding problem. Mora refused and Clements complained to Rose about Mora's intransigence. On January 27, 1994, Rose again counseled Mora for failure to follow up on a job order in which a student complained that a rock had been thrown through his window. Another employee repaired the window.

On February 23, 1994, Mora, Boroviak, White and Rose held a meeting to discuss Mr. Mora's performance appraisal for the period from July 1993 through January 1994. According to the evaluation form, Mora received an overall satisfactory rating, although he received extremely low scores in adaptability, attitude and initiative. A memorandum from Boroviak to Mora, dated April 20, 1994, discusses the results of an investigation into Mora's allegations at the February 23 meeting, including his charges of sexual misconduct, harassment, favoritism, falsification of a document and kickbacks. The memorandum documents Mora's mistrust of management at the University, his unwillingness to cooperate with Rose in developing a positive working relationship and his unsubstantiated charges of discrimination. Boroviak warned Mora that continued deficiencies in Mora's evaluations "could lead to termination." In addition, although Boroviak encouraged Mora to notify the University regarding any improper or illegal activity, he upbraided Mora for attacking Rose publicly, seemingly without concern for the reputation of the University or the Facilities Department.

After repeated requests for a contact phone number, Mora finally yielded and provided White with his number, with specific instructions not to share the number with the rest of the Department. When an emergency arose, the University discovered that the number that Mora had furnished was a nonworking number. In a memorandum from Boroviak to Mora, dated May 11, 1994, Boroviak documented Mora's refusal to provide a contact number to the University, even after Boroviak verbally warned Mora of the deficiency. Boroviak describes Mora's response to his requests as "combative" and "insubordinate."

In a memorandum from Boroviak to Mora, dated May 18, 1994, Boroviak informed Mora that he had reviewed this situation with Wilhemena Black and John Zanyk of Human Resources and had concluded that Mora's refusal to verify his emergency number demonstrated "poor judgement" "consistent with your history of problems at the University of Miami." The memorandum also informed Mora that his actions were grounds for disciplinary action. The University put Mora on administrative leave with pay for a one-week period and transferred Mora to the day shift "to provide you with closer supervision in a situation where there is less need for your interpretation of procedures."

On May 23, 1994, Mora filed a grievance seeking review of his discrimination claim and requesting a transfer back to the evening shift. In a memorandum from Boroviak to Mora, dated June 9, 1994, Boroviak advised Mora that the decision to transfer Mora would stand. Boroviak also stated that he would review Mora's work performance at the end of the summer to determine whether plaintiff continued to require the close supervision available only on the day shift.

Mora appealed Boroviak's decision directly to the University Vice Provost, Dr. Steve Ullmann. Mora also attempted to negotiate a leave of absence for one year with Vice Provost Ullmann. Dr. Ullmann referred Mora back to Human Resources. Mora then met with Zanyk from Human Resources, who proposed that Mora either continue with the grievance procedure, or consider taking a three month leave of absence followed by a thirteen-month layoff with no guarantee of reinstatement. Zanyk arranged a follow-up meeting with Mora on July 21, 1994. In a memorandum from Zanyk to Mora, dated August 10, 1994, Zanyk documented that plaintiff had failed to attend the scheduled meeting. Plaintiff also failed to attend the rescheduled meeting on August 3, 1994.

In a memorandum from Boroviak to Mora, dated September 1, 1994, Boroviak stated

that Mora had not informed the University of his decision regarding his employment status at the University. Boroviak explained that Mora had two options: he could take administrative leave or report for work on the day shift on September 12, 1994. In another memorandum from Boroviak to Mora, dated September 8, 1994, Boroviak documented Mora's attendance problems over the previous three months. Boroviak further documented Mora's contention that he had been in poor health. Boroviak told Mora that he would have to substantiate his absences with doctors' notes for each and every day of absence. He also instructed Mora to provide time sheets as required by the University.

Mora did not show up for work, as ordered, on September 12, 1994. Also, he did not respond to the University's overtures regarding a leave of absence. Mora called in sick on September 12, 13, and 14. On September 14, 1994, the University sent Mora a Federal Express overnight letter, instructing him to provide medical notes by September 16, to justify his absences of August 26, September 7, and September 12 through 14. Mora did not respond.

On September 21, 1994, the University sent a second overnight letter to Mora, stating that the University construed his failure to respond as a resignation from his position. On September 26, 1994, Mora sent a letter to Zanyk in which he informed the University that he considered himself to have been terminated. Included with his letter were doctors notes for the days in question, attesting to Mr. Mora's legitimate sickness in August and September.

On June 17, 1996, Mora filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and 42 U.S.C. § 1981. The University subsequently moved for summary judgment. Mora contends that the decision to transfer plaintiff from the night shift to the day shift and ultimately to "discharge" him was motivated by discriminatory animus against individuals of Columbian national origin and was undertaken for retaliatory reasons. In support of this theory, Mora offered affidavits containing statements of University employees, former employees and former students, allegedly constituting direct evidence of Mr. Rose's discriminatory animus.

Besides this alleged direct evidence of discrimination, Mora relies on circumstantial evidence to prove his claims for discrimination and retaliation. In support of his circumstantial evidence theory, Mora argues that competent summary judgment evidence demonstrates that he was qualified for his position and performed good work. Mora produced the same affidavits discussed above and other record evidence to recount instances of verbal denigration, disparate treatment and retaliation, allegedly based upon plaintiff's national origin.

## II. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen vs. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir.1997) (quoting *Anderson, supra* ).

The moving party has the burden to establish the absence of a genuine issue as to any material fact. *Tyson Foods, Inc.,* 121 F.3d at 646 (citing *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). The moving party may discharge this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325–26, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In deciding whether the burden has been satisfied, the Court must view the evidence and all reasonable inferences arising from it in the light most favorable to the nonmoving party. *Tyson Foods, Inc.,* 121 F.3d at 646 (*Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608).

Once the movant has satisfied its burden, the burden shifts to the nonmoving party to present evidence sufficient to make a "showing that the jury could reasonably find for

that party." *Allen,* 121 F.3d at 646 (citations omitted). Facts asserted by the party opposing a summary judgment must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 595 (5th Cir.1981). However, where the nonmoving party bears the burden of proof of an essential element to that party's case, summary judgment is warranted when the party fails to make a showing sufficient to establish the essential element. *Celotex,* 106 S.Ct. at 2552. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* The Eleventh Circuit commented on the non-movant's burden in *Fitzpatrick:*

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrating an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116–1117 (11th Cir.1993).

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Tyson Foods, Inc.,* 121 F.3d at 646.

### III. Discussion and Analysis

■ Title VII prohibits discrimination in hiring, discharge, and promotion in private employment on the basis of race, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). The Supreme Court has held that Title VII is intended to eradicate not only economic and tangible discrimination, but the entire spectrum of disparate treatment, which includes requiring people to work in a discriminatorily hostile or abusive environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

#### A. Discrimination

■ The Court must first address plaintiff's claim for national origin discrimination. Plaintiff bears the burden of proving that the University discriminated against him on the basis of his national origin. The first step is to establish a prima facie case of discrimination. *Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643 (11th Cir.1998). Plaintiff may rely on direct evidence of discriminatory intent, statistical evidence, or the four-pronged test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913 (11th Cir.1993). For purposes of this Motion, the Court must make a threshold determination of whether the affidavits produced by plaintiff are direct or circumstantial evidence of discrimination. The type of evidence before the Court, direct or circumstantial, "dramatically affects" the allocation of evidentiary burdens.[2] *Id.*

■ In evaluating a Title VII claim through circumstantial evidence, the Court is

---

**2.** If the plaintiff produces competent direct evidence of discriminatory intent, the defendant must prove by a preponderance of the evidence that the same employment decision would have been reached even absent the discriminatory motive. See *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Smith v. Horner,* 839 F.2d 1530, 1536

(11th Cir.1988). If the court finds that the evidence relied upon by plaintiff is circumstantial, the defendant employer's burden on rebuttal is to produce a legitimate, nondiscriminatory reason for the challenged employment decision. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. This is merely a burden of production not persuasion. See *Texas Dept. of Community Af-*

guided by the legal standard set forth in *McDonnell–Douglas, supra,* and its progeny. Under *McDonnell–Douglas,* a plaintiff has the initial burden of establishing a prima facie case of national origin discrimination by a preponderance of the evidence, which once established raises a presumption that the defendant discriminated against the plaintiff. *Carter,* 132 F.3d at 643. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions, a reason which is worthy of credence. *Id.* The defendant has the burden of production, and, thus, does not have to persuade a court that it was actually motivated by the reason advanced. *Id.* Once the defendant satisfies this burden of production, the plaintiff then has the burden of persuading a court that the proffered reason for the employment decision is a pretext for discrimination. *Id.* By so persuading the court, the plaintiff satisfies the required ultimate burden of demonstrating by a preponderance of the evidence that he or she has been the victim of intentional discrimination. *Id.*

■■■■ When an employee presents direct evidence of the employer's discriminatory motive, the *McDonnell–Douglas* framework is substantially altered. *Jones v. Gerwens,* 874 F.2d 1534, 1539, n. 8 (11th Cir.1989). In a discrimination case in which a plaintiff adduces direct evidence of discrimination, the Court must initially make a credibility finding as to whether or not plaintiff's proffered direct evidence of discrimination is to be believed. *Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 931 (11th Cir.1995) (citing *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990)). The Court must also make a finding of fact as to whether or not the decision maker "relied upon [national origin]-based considerations in coming to its decision." *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. 1775. In other words, the fact finder must determine whether "[national origin] played a motivating part in an employment decision." *Id.* at 244, 109 S.Ct. 1775.

fairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 773 (11th Cir.1982).

If the Court both credits the direct evidence and finds that the evidence played a substantial role in the employment decision at issue, then the defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role. *Id.* at 243–46, 109 S.Ct. 1775.

■■■■ Direct evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption. See *Burrell v. Board of Trustees of the Georgia Military College,* 125 F.3d 1390, 1393–94 (11th Cir.1997); *Carter,* 132 F.3d at 643 (citing *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997)). Generally, direct evidence relates to the actions, statements or bias of the person making the challenged employment decision. See *Trotter v. Board of Trustees of University of Alabama,* 91 F.3d 1449, 1453–1454 (11th Cir. 1996). If, however, the evidence presented is by inference subject to more than one possible meaning, it is not direct evidence and must be considered circumstantial evidence. *Carter,* 132 F.3d at 643 (citing *Harris v. Shelby County Bd. of Educ.,* 99 F.3d 1078, 1082–1083 n. 2 (11th Cir.1996)).

■■■■ Applying these principles to the case at bar, the Court must first examine the evidence submitted by plaintiff to determine whether it is worthy of credence. Plaintiff submits three affidavits from former University employees, Alison Heard, Eliseo Rodriguez, and Jose Trujillo, and two unsworn "witness" statements from Rajeev Ravindran and Sieve Koganti, as "direct" evidence of discrimination. At the outset, the Court notes that the witness statements of Rajeev Ravindran and Sieve Koganti are unsworn, and, therefore, do not constitute competent summary judgment evidence for consideration by this Court. See Fed.R.Civ.P. 56(e). And the Court finds that the statement of Jose Trujillo is of little probative value, as Mr. Trujillo's connection with the University ended sometime in 1990, three years prior to the relevant time frame set forth in plaintiff's complaint.[3] Nevertheless, the Court will

3. The substance of Mr. Trujillo's statement—that he overhead Durante state that he believed that plaintiff was a Columbian drug dealer—does not rise to level of direct evidence of discrimination.

consider the affidavits of Alison Heard and Eliseo Rodriguez to determine whether the statements therein constitute direct evidence of discrimination.

■ Ms. Heard attested in her affidavit that she overheard "anglo supervisors," including Al Rose and Jimmy Durante, commenting among themselves that plaintiff had very little prospect of promotion. (Heard Aff. ¶ 4). In deposition, Ms. Heard clarified her statement; she testified that on one occasion she overheard Durante and/or Rose making comments in this vein and that the speakers made no reference to plaintiff's national origin. (Heard Dep. at 21). This is not direct evidence of discrimination, as Rose's opinion may have stemmed from any number of legitimate, non-discriminatory reasons, including plaintiff's well-documented attitude problems.

■ Ms. Heard also stated that Durante and Rose made "negative statements about Frank Mora's Colombian background and their belief that he was a drug dealer." (Heard Aff. ¶ 5). In deposition, Ms. Heard qualified her affidavit statements; she testified that, on one occasion, she overheard Durante and Rose comment that given Mora's luxurious cars and home, he must either be a drug dealer or have a wealthy wife. (Heard Dep. at 23). Again, these statements do not constitute direct evidence of discrimination. First, there is no nexus between the statements and any adverse employment action, see *Evans*, 131 F.3d at 962; *Burrell*, 125 F.3d at 1394, n. 7, and second,

the statements do not rise to the level of those in *Alton Packaging Corp., supra*, where broad, derogatory statements about plaintiff's race were sufficient to demonstrate a general discriminatory animus against blacks. *Id.* (citing *Alton Packaging Corp., supra* ).

Next, the Court must consider the affidavit and deposition testimony of Eliseo Rodriguez. Mr. Rodriguez stated in his affidavit that he had heard Durante and Rose question how plaintiff could afford his nice cars and clothes on his wages, and further comment, (1) that Columbians are lazy and do not want to take orders, and (2) that plaintiff's clothing was too neat and clean. In deposition, Rodriguez qualified his affidavit statements and further explained the circumstances surrounding these statements.[4]

■ Mr. Rodriguez's deposition testimony demonstrates that neither Durante nor Rose made any actionable discriminatory statements toward Columbians. Rodriguez testified in deposition that he could only recount one statement in this vein: "The Columbian is lazy, he doesn't want to work." (Rodriguez Dep. at 23). Yet this statement has no connection to defendant's decision to transfer plaintiff to the day slot. Nor is there any other nexus between this statement and the "adverse" employment decision to discharge plaintiff after failing to respond to the University's overtures.[5]

■ Having decided that the evidence of discrimination here is circumstantial, the

There is no connection between this statement and any adverse employment decision alleged by plaintiff to have taken place several years later. See *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir.1997) (stray racially insensitive statements not direct evidence when statements not linked to alleged discriminatory employment practice); see, e.g., *Burrell*, 125 F.3d at 1394, n. 7. In addition, this statement does nor rise to the level of "general racially discriminatory statements" which would may also form the basis for finding direct evidence of discrimination *Id.* (citing *EEOC v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir.1990)). Moreover, Durante was not involved in making the decision to transfer plaintiff to the day shift or to "discharge" him. *Evans*, 131 F.3d at 962.

4. Rodriguez explained that everyone on the maintenance staff worked during the day in the

summertime, but plaintiff continued to work his evening shift from 4:00 p.m. to 12:00 a.m. Plaintiff arrived at work each day as the day-shift workers were leaving. On many occasions, Mora would arrive in an expensive car, including a Mercedes and a BMW, and would proceed to work in nice clothes. The workers and supervisors would comment on plaintiff's clothes and automobiles.

5. The Court notes that Boroviak made the decision to change plaintiff's work shift and to "discharge" plaintiff, not Durante or Rose. At most, therefore, Durante's statement was a "stray" comment by a non-decisionmaker, which is not direct evidence of discriminatory intent. *Evans*, 131 F.3d at 962; *Wilde v. Florida Pneumatic Mfg. Corp.*, 941 F.Supp. 1203, 1206 (S.D.Fla.1996).

Court must examine plaintiff's discrimination claim under the *McDonnell–Douglas* framework. Under *McDonnell–Douglas,* a plaintiff has the initial burden of establishing a prima facie case of national origin discrimination. *Carter,* 132 F.3d at 643. A prima facie case of discriminatory discharge requires a plaintiff to show that he was a member of a protected class; he was qualified for the job; he was terminated despite his qualifications; and after his termination, the position remained open and the employer continued to seek applicants of similar qualifications. *Evans,* 131 F.3d at 964 (citing *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1375 (11th Cir.1996)).

In the case at bar, plaintiff indisputably satisfies the first prong: Mora is of Columbian descent and is a member of a protected class. But defendant contends that plaintiff cannot demonstrate that he was qualified for the position of Mechanic III on the second shift or that he suffered an adverse employment action. In regard to plaintiff's qualifications, defendant does not question whether plaintiff had the skills to perform the work, as plaintiff sets forth competent record evidence of his skills, including Ms. Heard's affidavit, and the deposition testimony of Mr. Perez and even Mr. Boroviak. Instead, defendant asserts that plaintiff's uncooperative and insubordinate attitude and his lapses at work demonstrate that he required supervision, which was not available on the second shift.

An employee is qualified for a position, if the employee's work was satisfactory prior to the date of the alleged adverse employment action. *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1282–83 (7th Cir.1977) ("The plaintiff need not show perfect performance or even average performance to satisfy this element. He need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him"). Plaintiff adduces competent record evidence establishing that he had received a satisfactory rating or better in his work appraisals throughout his career at the University, including Mr. Rose's final appraisal. Ms. Heard's affidavit further states that "[plaintiff] consistently followed through on the service orders assigned to him ...." Although evidence adduced by defendant raises questions regarding the accuracy of Ms. Heard's statement, the record evidence is sufficient to establish the second prong of plaintiff's prima facie case.

To establish the third prong, an adverse employment action, plaintiff must show that the University's actions impacted negatively upon the terms, conditions, or privileges of his employment. *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996). The Supreme Court recently made clear that although Title VII mentions specific employment decisions with immediate consequences, the scope of the prohibition " 'is not limited to "economic" or "tangible" discrimination,' " *Faragher v. City of Boca Raton,* —— U.S. ——, ——, 118 S.Ct. 2275, 141 L.Ed.2d 662, 1998 WL 336322, *8 (1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)), and that Title VII covers more than " 'terms' and 'conditions' in the narrow contractual sense." *Id.* (quoting *Oncale v. Sundowner Offshore Services, Inc.,* —— U.S. ——, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998)).

It is clear, however, that not all employment actions are actionable under Title VII. See *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir.1985) ("The employment discrimination laws ... cannot be transformed into a palliative for every workplace grievance, real or imagined...."); see, e.g., *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997) (" 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' 'Ultimate employment decisions' include acts 'such as hiring, granting leave, discharging, promoting, and compensating.' ") (quoting *Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995)).

Plaintiff contends that his discharge constitutes an adverse employment decision. Defendant responds that plaintiff effectively resigned by failing to respond to defendants' repeated requests to discuss his options and to provide documentation regarding his absences. Discharge clearly

qualifies as an ultimate employment decision affecting the terms and conditions of an individual's employment. *Id.* Taking all inferences in favor of plaintiff, as the Court must, the record evidence indicates that the University ultimately informed plaintiff that his employment had been terminated. Again, defendant may have legitimate reasons for its actions, but the Court will not deem Mora's lack of response as a resignation for purposes of plaintiff's prima facie case.

■ Having determined that plaintiff successfully proved a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for moving plaintiff to the day shift and, ultimately, discharging him from his position with the University. Under prevailing Eleventh Circuit law, defendant's burden is exceedingly light. See *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir.1983). Here, defendant transferred plaintiff to the day shift because of his work lapses and insubordinate attitude. While there were no supervisors on duty during the evening shift, Mora's supervisors could keep a close watch over plaintiff on the day shift. Defendant ultimately discharged plaintiff when Mora failed to respond to defendant's repeated attempts to obtain, 1) doctor's excuses for his absences, and 2) an answer on whether plaintiff intended to take a leave of absence or work on the day shift. The Court finds that defendant has met its burden.

■ A plaintiff, nevertheless, can survive summary judgment by presenting evidence demonstrating a genuine issue of material fact as to the truth or falsity of each of the employer's legitimate, nondiscriminatory reasons. *Evans,* 131 F.3d at 964–65 (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1530–32 (11th Cir.1997)). Defendant produces competent record evidence to support its contention that plaintiff required supervision which was only available on the day

shift. As stated above, Mora received exceedingly low ratings in his review in the areas of adaptability, attitude and initiative. These attributes were critical to plaintiff's success on the evening shift, because Mora was one of only two maintenance workers on duty and there was no supervisor to monitor his work. As far back as June 1993, Weber warned plaintiff of the importance of initiative and dependability on the night shift. And Boroviak brought this point home when he offered to transfer Mora back to the night shift, "if you demonstrate good faith improvement that you can work with little or no supervision."

In addition, the overwhelming evidence of Mora's conduct under Lipson, Sargent and then Rose, demonstrates that the University could not rely upon Mora on the night shift. Under Lipson, Mora took on the responsibility to cover for Mr. Figueroa and, yet, he left work without finding coverage for his own shift and without notifying anyone of his intent to leave. Mora also violated University policy by driving across the University lawn. Under Sargent, Mora was counseled for reacting in an inappropriate manner to a student employee's complaint about his work. Mora retaliated by filing a grievance against Sargent.

Notwithstanding plaintiff's good relationship with Mr. Perez, Mora's errant behavior continued under Rose. Plaintiff refused to provide the University with a home contact number. When he finally complied with the University's directive, the number was non-working and he refused to confirm the number. Also, plaintiff was derelict in his duty: unable to reach plaintiff to handle a plumbing emergency, the University had to call a standby plumber at considerable expense. Moreover, plaintiff refused to investigate a flooding problem and a broken window in January 1994. Other employees had to cover for plaintiff, and Rose counseled Mora on both occasions.[6]

---

**6.** Plaintiff argues that the contrast between Rose and Perez's assessment of plaintiff demonstrates that Rose's dissatisfaction with plaintiff's work stemmed from discriminatory animus. The evidence demonstrates, however, that Mora had problems with many of his supervisors. Mr. Perez was the exception. In addition, at least one other court in this district has held that a new supervisor's more critical approach to a

plaintiff's work does not constitute evidence of discrimination. *Hamalainen v. Mister Grocer Corp.,* 735 F.Supp. 1025, 1028 (S.D.Fla.1990) ("[I]t has been held that a change in supervision which brings about a more critical approach toward an employee's work which results in dissatisfaction with the work-product, is a legiti-

In short, defendant sets forth persuasive record evidence demonstrating Mora's insubordinate attitude and misfeasance on the job. Plaintiff produces no evidence in response to suggest that the University's decision to transfer Mora to the day shift was motivated by anything other than Mora's demonstrated inability to work without supervision. In addition, Boroviak made the decision to transfer plaintiff; there is no record evidence of discriminatory animus on the part of Boroviak.

Also, there is no evidence that Boroviak and Zanyk discharged plaintiff for discriminatory reasons. Even crediting plaintiff's testimony that he had provided doctors' notes to defendant prior to defendant's September 16 deadline, Mora indisputably failed to respond to defendant's repeated requests for a decision regarding whether Mora would begin work on the day shift or take a leave of absence. That plaintiff finally responded to the University's overtures ten days after the initial deadline and five days after receiving notice of his discharge does not change this Court's ruling. In fact, it simply reinforces the Court's conclusion that Mora is unable to follow directives and work within the management structure of the University.

Plaintiff argues, however, that Rose's discriminatory animus, as demonstrated by his derogatory comments about plaintiff as a Columbian, infected Boroviak's "independent" decision to discipline plaintiff and eventually to terminate his employment. In support of this argument, Mora cites *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446 (7th Cir. 1996), for the proposition that a supervisor's discriminatory animus may be imputed to the manager who discharged the employee, even though there is no evidence that the decision-making manager had discriminatory intent. In this regard, the Court notes first that *Dey* is not binding Eleventh Circuit precedent. Also, the Court can find no Eleventh Circuit case consistent with *Dey*. In fact, the Eleventh Circuit case law suggests otherwise, as only statements by decision makers are actionable. See *Evans*, 131 F.3d at 962. Accordingly, defendant's motion for summary

mate reason for termination; as such, it does not constitute evidence of discrimination").

judgment on plaintiff's discrimination claim shall be granted.

**B. Retaliation**

Under Title VII, employers are prohibited from discriminating or retaliating against an employee who has either (1) opposed an employment practice made unlawful under Title VII, or (2) made a charge, or participated in any manner in an investigation, proceeding or hearing under Title VII. 42 U.S.C. § 2000e–3(a). To make out a prima facie retaliation claim requires a showing that (1) the plaintiff engaged in protected opposition to Title VII discrimination, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. See *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir.1997); *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir.1995) (per curiam); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 920 (11th Cir.1993).

Even if plaintiff could establish a prima facie case for retaliation, Defendant has adequately articulated nondiscriminatory reasons for its actions. Plaintiff has failed to produce competent record evidence demonstrating that defendant's decision to discharge plaintiff was pretextual. See *Combs*, 106 F.3d at 1528; *Isenbergh*, 97 F.3d at 440–41. The undisputed facts indicate that plaintiff repeatedly failed to meet with defendant to discusses Mora's employment options. As a last resort, defendant contacted plaintiff via federal express, instructing plaintiff to submit doctors notes explaining his absences and further ordering plaintiff to report to work on the day shift or take a leave of absence. The parties dispute whether plaintiff submitted doctor's notes prior to September 16. Even crediting plaintiff's testimony, however, it is undisputed that plaintiff never responded to defendant's overtures regarding whether Mora would begin work on the day shift.[7] Without proof of pretext, the Court will not construe Boroviak's actions as providing a basis for a retaliation claim.

7. The Court notes that plaintiff filed a number of grievances against supervisory personnel during his tenure with the University, including the grievance against Lipson as far back as 1985.

Based upon the foregoing and taking all inferences in favor of plaintiff, as the Court must, the Court concludes that plaintiff is unable adduce competent summary judgment evidence demonstrating that the proffered reasons for the University's actions were pretextual. *Combs v. Plantation Patterns,* 106 F.3d at 1538 (under *McDonnell–Douglas* framework, the Court must determine whether plaintiff has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in each proffered legitimate reason for its actions). Accordingly, it is

**ORDERED AND ADJUDGED** that defendant's Motion for Summary Judgment [D.E. # 32] be, and it is hereby GRANTED. It is further

**ORDERED AND ADJUDGED** that the Clerk of Court is directed to CLOSE this matter. It is further

**ORDERED AND ADJUDGED** that all pending motions, not addressed by this order, are DENIED AS MOOT.