Patricia P. NEALEY, Plaintiff,

v.

UNIVERSITY HEALTH SERVICES, INC., d/b/a University Hospital; and Medical Center of Central Georgia, Inc., formerly d/b/a CareSouth Home Care, Defendants.

No. CIV.A. CV199–048.

United States District Court,
S.D. Georgia,
Augusta Division.

June 21, 2000.

John Michael Brown, Augusta, GA, Amy S. Gellins, Athens, GA, for Patricia P. Nealey, plaintiffs.

Raymond G. Chadwick, Jr., Laurel L. Payne, Kilpatrick Stockton, LLP, Augusta, GA, Sharon Parker Morgan, Joseph M. Freeman, Laura K. Johnson, Victor A. Cavanaugh, Elarbee Thompson & Trapnell, LLP, Atlanta, GA, Roy Harold Meeks, Pursley, Howell, Lowery & Meeks, Atlanta, GA, for University Health Services, Inc., defendants.

### ORDER

ALAIMO, District Judge.

Plaintiff brought suit against both the Medical Center of Central Georgia, Inc. ("MCCG"), and University Health Services ("UHS") under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e et seq. (Title VII of the Civil Rights Act of 1964), alleging racial discrimination in the terms and conditions of her employment, her compensation, failure to promote, and retaliatory discharge. MCCG, the sole remaining defendant in the above-captioned action, has moved for summary judgment on Plaintiff's claims.[1] After careful consideration of the parties' briefs and their attachments thereto, and for the reasons stated below, the Court will **DENY** Defendant's motion.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that a movant is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ..." The Federal Rules mandate granting of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under der governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute regarding even a material issue, however, must be " 'genuine;' that is, the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Evidence adduced in summary judgment proceedings must be evaluated in the light most favorable to the non-movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir.1983). However, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (internal citations omitted). All reasonable inferences must be in favor of the party opposing the motion. *Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Company*, 802 F.2d 1352, 1356 (11th Cir.1986). In determining whether an inference is reasonable, the court must look to "the record as a whole." *Id.* at 1360. Inferences that are speculative and conjectural, however, are not reasonable. *Chapman v. American Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir.1988); *Lee v. Celotex Corporation*, 764 F.2d 1489, 1491 (11th Cir.1985). Once a moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party opposed to the summary judgment motion "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses ... must set forth specific facts showing that there is a genuine issue for

---

1. UHS has already reached a settlement with Defendant.

trial." *Walker v. Darby,* 911 F.2d 1573, 1576–77 (11th Cir.1990).

## II. *FACTS*

Plaintiff is an African–American female nurse who works in the field of home health care. Her tenure at the home health care facility in Warrenton, Georgia (the "Warrenton facility")—the site of the alleged unlawful employment practices that gave rise to this suit—began in May, 1993. At that time the facility was owned by Healthmaster, a company unrelated to any of the parties in this litigation. MCCG purchased the Warrenton facility in November, 1995, as part of Healthmaster's Chapter 11 reorganization. Throughout the period in which MCCG owned the Warrenton facility, management and administrative services were provided by CareSouth, which, at that time, was an affiliate of MCCG.[2] MCCG continued to own the Warrenton facility until it was sold to UHS on October 31, 1996, pursuant to the terms of the Asset Purchase Agreement ("APA") executed solely between MCCG and UHS. On the same day that UHS agreed to purchase the Warrenton facility from MCCG, it also simultaneously entered into a Home Health Agency Management Agreement ("HHAMA") with CareSouth under the terms of which CareSouth agreed to provide management and administrative services to the Warrenton facility. Plaintiff continued to work as a nurse in the Warrenton facility until June 6, 1997, when UHS terminated her employment. Plaintiff, however, was subsequently reinstated to her position, pursuant to the terms of a settlement with UHS that resolved her § 1981 and Title VII claims against that defendant.

**2.** MCCG and CareSouth were "sister" companies who shared a common corporate parent, Central Georgia Health Systems, Inc. Although they were related entities, CareSouth and MCCG were never in a parent-subsidiary relationship, except for perhaps a very short time. CareSouth was sold to an outside party in early 1998. In any event, the precise corporate relationship of CareSouth to MCCG, for present purposes, is immaterial.

During Plaintiff's tenure at the Warrenton facility, Martha Hemphill was the administrator in charge until October of 1996. Hemphill was succeeded by Nellie Ramage as administrator in charge of the Thomson Division, beginning in November of 1996. They supervised Nealey's performance of her job-related duties as well as that of other MCCG employees who worked in MCCG's Thomson Division. Hemphill was also responsible for determining employees' salaries, as well as hiring, firing, and promotion decisions. Both Hemphill and Ramage were employees of CareSouth, MCCG's "sister company."

Hemphill, along with her friend and assistant, Edith Allen, frequently used racial slurs to describe African–American employees of MCCG, including referring to them as "niggers." One employee claimed to have heard Hemphill use the term "nigger" over 20 times. (*Pessante Dep.,* Ex. 3 at 490). Hemphill also made other derogatory statements about African–American employees, including "you know how they all are, you can't get them to do anything," after a conversation with Plaintiff in which the latter asked permission for leave to take her father (who was then dying of cancer) to Alabama for treatment. (*Rocker Dep.* at 23).

Hemphill also engaged in nepotism to the detriment of Juanita Appling, an African–American file clerk whom she passed over for a promotion to office manager in favor of Becky Hughes, Hemphill's sister, despite a general policy of promoting employees to fill open positions whenever feasible instead of recruiting outsiders.[3] (*Id.,* Ex. 8 at 28). Hemphill and Allen also justified their decision not to consider Appling for this position in racial terms, saying that "You know how they are, you

The Warrenton facility was part of MCCG's Thomson Division.

**3.** There was also evidence that Hemphill and Allen forged records of interviews in an attempt to conceal the fact that Hemphill went outside established procedures to hire her own sister.

know she couldn't handle that job." (*Rocker*[4] *Dep.* at 57).

Hemphill and Allen also made a habit of requesting African–American Home Health Aides ("HHAs") to perform personal services, such as cleaning their homes or ironing their clothes. On at least one occasion, Hemphill changed the schedule of an HHA to allow her to clean Hemphill's home during work hours. Of the sixty HHAs under Hemphill's supervision, only three were white. (*Pessante Dep.*, Ex. 3 at 502). No white staff of any level was ever asked to go to Hemphill's or Allen's home to clean house. (*Rocker Dep.* at 26). Black employees, however, according to Rocker, "were automatically handicapped and seen as subservient." (*Id.*).

As a result of Hemphill's abusive management style, a group of employees working out of MCCG's Thomson Division sent a fax on September 23, 1996, to Ronald Connors, President of CareSouth, to complain about the conduct of Hemphill and Allen, as well as other supervisory personnel. (*Pessante Dep.*, Ex. 1). Although Plaintiff was not one of the seven signatories of that fax, some of the discriminatory conduct which she challenges in this lawsuit were mentioned in the grievance. (*Id.* at 2, § II ¶¶ 2, 4, 5). As a result of this complaint, an investigation was initiated that ultimately led to Hemphill and Allen agreeing to tender their resignations in early October, 1996, in exchange for signing confidentiality agreements with CareSouth.

Nelle Ramage succeeded to Hemphill's position by October 31, 1996, and she continued in this position even after MCCG sold this facility to UHS under the terms of the HHAMA between UHS and CareSouth. Thus, Plaintiff continued to be managed by CareSouth even after MCCG ceased being her nominal employer.

Ramage was a long-time associate of Hemphill dating back to the days when they worked for Healthmaster. (*Rocker Dep.* at 41 and 47). According to Rocker, Ramage believed the employees who brought the grievance against Hemphill and Allen "were the enemy." (*Id.* at 40).

Plaintiff attributes her difficulties with Ramage to the fact that she filed an EEOC charge in September, 1996. Frances Harris, UHS' Employees Relations Specialist, testified in deposition that Ramage had mentioned that Plaintiff had filed an EEOC charge prior to the MCCG–UHS deal; that it bothered her; and, that she was "upset about the EEOC charge." (*Harris Dep.* at 28–31, 45). In late February, 1997, after a patient complaint was brought against Plaintiff, Ramage completed a written disciplinary action against Plaintiff without giving her an opportunity to explain her own version of events. This violated UHS' procedure for disciplinary action. (*Harris Dep.* at 44–45; *Ramage Dep.* at 59, 65, 73, 78–80). Plaintiff met with Ramage on February 27, 1997, to discuss the reprimand. She told Ramage that she believed she was being reprimanded in retaliation for her filing an EEOC charge. At this point, Ramage became very upset and violently grabbed Plaintiff's arm. (*Nealey Dep.* at 210–13). Other persons witnessed Plaintiff's distress just after her meeting with Ramage. Ramage's retaliatory conduct continued until June 6, 1997, when UHS terminated Nealey's employment upon Ramage's recommendation.

Plaintiff's complaint cites several specific acts of discrimination that entitle her to recover under both § 1981 and Title VII. First, she alleges that she was the victim of discriminatory discipline. (Plaintiff's Amended Complaint ¶ 16). Second, she alleges that during her tenure with MCCG, she was paid less than white nurses, although she performed substantially similar duties. *Id.* at ¶ 17. Third, she alleges that she was denied leave from work while white nurses, in similar circumstances, were granted leaves of absence. *Id.* at ¶ 18. Fourth, Plaintiff alleges that MCCG placed her health and safety at risk by intentionally exposing her to unsafe work conditions in April and May of 1996,

---

4. Bonnie Rocker was a medical social worker.

presumably because of her race. *Id.* at ¶ 19. Fifth, she also alleges she was denied promotion to the position of supervisor in the Warrenton facility because of her race. *Id.* at ¶ 20. Sixth, Plaintiff alleges that her termination from UHS on June 6, 1997 was a result not only of intentional discrimination, but also in retaliation for her decision to file a charge of discrimination with the EEOC. *Id.* at ¶ 29.

In addition to compensatory damages, Plaintiff also seeks punitive damages and attorney's fees. *Id.* at ¶¶ 50, 51.

## III. *DISCUSSION*

Defendant's summary judgment motion involves legal defenses in addition to challenging the factual sufficiency of Plaintiff's claims. Defendant argues that Plaintiff's § 1981 claim and her failure to promote claim are untimely. Defendant also argues that it cannot be liable for the discriminatory conduct at issue because Plaintiff does not allege that MCCG employees were responsible for the discriminatory conduct. In the alternative, Defendant argues that even if Plaintiff's claims survive these legal hurdles, she has failed to make out a prima facie case of discrimination.

## A. *Limitations Period for § 1981 Claim*

Defendant argues that under relevant Supreme Court precedent, a federal court is obliged to adopt as the statute of limitations for a § 1981 claim the statute of limitations for a personal injury claim occurring in the state where the federal claim arose. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660–62, 107 S.Ct. 2617, 2620–21, 96 L.Ed.2d 572 (1987) (the forum state's statute of limitations for personal injury actions provides the appropriate

limitations period for civil rights claims under § 1981). It is undisputed that Georgia's statute of limitations for personal injury is two years. Plaintiff's original complaint, however, was filed on February 23, 1999. If Defendant is correct in its analysis of the limitations period, any conduct violating § 1981 prior to February 23, 1997 would be barred under *Goodman.*

Plaintiff counters Defendant's argument by suggesting that *Goodman* 's holding (mandating the "borrowing" of the forum state's limitations period for personal injury) is not determinative. Instead, she argues that the four-year, general purpose limitations period established by Congress in 1990 should apply to her § 1981 claim. 28 U.S.C. § 1658.[5] That statute provides a default four-year limitations period for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section." Under the plain meaning of § 1658, any act enacted by Congress after December 1, 1990, is subject to a four-year statute of limitations unless Congress provides otherwise. Plaintiff concedes § 1981 was originally enacted prior to the enactment of § 1658. She argues that this is not determinative, however, because her § 1981 *claim* arises under The Civil Rights Act of 1991 (he "1991 Act"). (Pub.L. No. 102–166, Stat. 1074 (1991)). If she is correct, § 1981 would provide her a remedy for any wrongful conduct of Defendant reaching back to February 23, 1995.

Section 101 of the 1991 Act contained two new provisions, which were then codified as subsections (b) and (c) of the § 1981.[6] The contract provision of the Civil Rights Act of 1866 (codified at 42 U.S.C. § 1981) had been a single sentence.[7] The Supreme Court, however,

5. Section 1658, enacted on December 1, 1990, provides that "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."

6. Subsection (b) of § 1981 provides that "the term 'make and enforce contracts' includes the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

7. Section 1981, prior to the Civil Rights Act of 1991, had been limited to what now appears as § 1981(a). That provision provides, in relevant part, that "All persons within the jurisdiction of the United States shall have the

held in 1989 that § 1981 applied only to the formation of contracts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). It was partially in response to *Patterson* that Congress enacted the 1991 Act. Indeed, the Supreme Court itself has described the 1991 Act as "expanding the scope of relevant civil rights statutes" rather than "restoring" preexisting rights. *Rivers v. Roadway Express,* 511 U.S. 298, 308, 114 S.Ct. 1510, 1517, 128 L.Ed.2d 274 (1994). Plaintiff's cause of action in this case arises under § 1981(b), a cause of action created by the 1991 Act. Thus, the question facing the Court is whether Plaintiff's § 1981(b) claim arises under "an Act of Congress enacted after" December 1, 1990 for purposes of applying § 1658's four-year limitation period.

The Eleventh Circuit has yet to rule on the applicability of § 1658 to a § 1981(b) claim. Nor has the Court found published authority from other circuits on this point.[8] Several district courts have considered this issue in reported decisions, but no clear consensus has emerged. *Compare Rodgers v. Apple South, Inc.,* 35 F.Supp.2d 974 (W.D.Ky.1999) (applying § 1658 to § 1981); *Miller v. Federal Express Corp.,* 56 F.Supp.2d 955 (W.D.Tenn.1999) (same); *Alexander v. Precision Machining, Inc.,* 990 F.Supp. 1304 (D.Kan.1997) (same); and, *Stewart v. Coors Brewing Co.,* 1998 WL 880462 (D.Colo.1998) (same) *with Zubi v. AT&T Corp.,* 1999 WL 334916 (D.N.J. 1999) (finding § 1658's four-year limitation period is not applicable to a § 1981 action); *Davis v. California Dep't. of Corrections,* 1996 WL 271001 (E.D.Cal.1996) (same); *Lasley v. Hershey Foods Corp.,* 35 F.Supp.2d 1319 (D.Kan.1999) (same); *Mohankumar v. Dunn,* 59 F.Supp.2d 1123 (D.Kan.1999) (same); and, *Lane v. Ogden Entertainment, Inc.,* 13 F.Supp.2d 1261 (M.D.Ala.1998) (same).

same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens."

The difficulty posed by Plaintiff's claim lies in the fact that, on the one hand, her cause of action, § 1981(b), arises under a statutory provision, the 1991 Act, that was enacted after December 1, 1990. On the other hand, § 1981 was originally enacted shortly after the Civil War. Nevertheless, it is difficult to understand why the 1991 Act that created Plaintiff's cause of action does not fall within the scope of § 1658. The 1991 Act is clearly "an Act of Congress" that was enacted after December 1, 1990. *See, for example, Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (referring throughout the opinion to the Civil Rights Act of 1991 as distinct from Title VII (the Civil Rights Act of 1964) even though the 1991 Act amended Title VII). The fact that the Congressional enactment at issue amends an already existing Congressional enactment does not appear sufficient to exclude such an amending enactment from the plain language of § 1658. Otherwise, courts would be required "to decide when an Act of Congress is not an Act of Congress." *Alexander,* 990 F.Supp. at 1308.

■ The Supreme Court has stated that the expectation of "borrowing" a statute of limitations from state law "is reversed for statutes passed after December 1, 1990, the effective date of 28 U.S.C. § 1658." *North Star Steel Co. v. Thomas,* 515 U.S. 29, 34, 115 S.Ct. 1927, 1930, 132 L.Ed.2d 27 (1995). When Congress enacts a statute creating a new cause of action, but incorporates it into a statute existing prior to December 1, 1990, there is no "expectation" that courts are to borrow the analogous limitations period from the forum state. Instead, they should apply the four-year period provided by § 1658. Because Plaintiff's cause of action arises under the 1991 Act, the Court concludes that § 1658's four-year limitations period ap-

8. In an unpublished decision, the Sixth Circuit held that § 1658's four-year limitations period applied to a plaintiff's § 1981(b) claim. *Young v. Sabbatine,* 142 F.3d 438, 1998 WL 136559 (6th Cir.1998).

plies. Accordingly, Plaintiff's § 1981(b) claim is timely.

## B. *Limitations Period for Plaintiff's Title VII Failure to Promote Claim*

Defendant alleges that Plaintiff's failure to promote claim is untimely, because she failed to file a complaint with the EEOC within 180 days after she was unlawfully denied promotion to the position of nursing supervisor as required by 42 U.S.C. § 2000e–5(e). According to Defendant the position at issue became open in December of 1995, at which point it was temporarily filled by a white co-worker, Debra Dollar. The position was not permanently filled, however, until May, 1996, when Angela Hardy began her employment as nursing supervisor. Plaintiff filed her claim with the EEOC on September 30, 1996.

■ If the 180–day filing requirement began to run from the December, 1995, date, Plaintiff's complaint would be untimely. If, on the other hand, the filing requirement begins to run from the date in May when Angela Hardy began her tenure, Plaintiff's complaint satisfies Title VII's 180–day filing requirement. Defendant, in support of its position, urges the Court to apply the rule of *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). In that case the Supreme Court held that "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." *Id.*; 101 S.Ct. at 504. Unlike the facts of that case (which involved discriminatory dismissal) here Plaintiff was twice the victim of discriminatory acts: first, when Defendant hired a white co-worker as a temporary nursing supervisor in December, 1995; and, second, when Defendant permanently hired Angela Hardy to fill the position of nursing supervisor in April/May 1996. Accordingly, the limitations period began to run in May, 1996, and, thus, Plaintiff's claim was timely filed.

Eleventh Circuit precedent confirms this conclusion. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n. 19 ("the time for filing an EEOC charge begins to run when the employee receives unequivocal notice of the adverse employment decision."), *cert. denied* by *Helton v. Kmart*, 519 U.S. 982, 117 S.Ct. 435, 136 L.Ed.2d 332, and *cert. denied* by *Kmart v. Helton*, 519 U.S. 987, 117 S.Ct. 447, 136 L.Ed.2d 342 (1996). While the Plaintiff could have suspected that Defendant would not offer her the position, she could not have known that for a fact until May, 1996, when Angela Hardy was hired to fill the position permanently. Therefore, § 2000e–5(e) does not bar Plaintiff from challenging Defendant's decision to hire Angela Hardy (a white, non-employee) instead of Plaintiff.

## C. *Attribution of CareSouth's Discriminatory Conduct to MCCG*

Both CareSouth and MCCG—at all times relevant to this lawsuit—were wholly-owned subsidiaries of Central Georgia Health Systems, Inc. ("CGHS"). MCCG owned the home health care facilities where Plaintiff worked. It was also Plaintiff's common law employer. MCCG, however, did not exercise any control over its employees, including Plaintiff, at least not directly. Instead, it contracted with CareSouth to provide administrative and management services to MCCG's home health care facilities.[9] Kenneth Banks, the Vice President, General Counsel and Corporation Secretary of CGHS, stated in his affidavit that "MCCG delegated to CareSouth the authority to run the day-to-day administrative operations of these offices, including setting salaries and implementing policies and procedures." (*Banks' Affidavit* ¶ 7).

There is no evidence suggesting that the relationship of CareSouth to MCCG was fraudulent or in any way irregular. De-

---

**9.** When MCCG acquired these home health care facilities from Healthmaster in November 1995, it placed all Healthmaster's former employees who were involved in the delivery of health care services under the employment of MCCG. It made Healthmaster's former management and administrative personnel employees of CareSouth.

fendant argues that because CareSouth is an independent company, MCCG cannot be held liable for any acts of discrimination committed by CareSouth after October 31, 1996, when Defendant sold its home health care facilities to UHS. Defendant does not argue that this defense applies to Care-South's discriminatory conduct prior to that date.

It is undisputed that MCCG and Care-South were an "integrated firm" for purposes of Title VII liability, at least through October 31, 1996. It is further undisputed that Plaintiff had become an employee of UHS no later than December, 1996. (*Plaintiff's Response to Defendant's Statement of Material Facts* ¶ 6). Defendant argues that, absent special circumstances not shown here, it cannot be liable for any discrimination suffered by Plaintiff while she was an employee of UHS, even if Nelle Ramage, an employee of CareSouth, was responsible for that discrimination.

 The definition of "employer" under Title VII is considerably broader than it is under the common law. Thus, "[i]n keeping with this liberal construction, we sometimes look beyond the nominal independence of an entity and ask whether two or more ostensibly separate entities should be treated as a singly, integrated enterprise when determining whether a plaintiff's 'employer' comes within the coverage of Title VII." *Lyes v. City of Riviera Beach, Florida,* 166 F.3d 1332, 1341 (11th Cir.1999). Accordingly, courts have recognized three circumstances in which multiple enterprises can be aggregated under Title VII. The first is the "single employer" or "integrated enterprise" test. Under this test, a court considers the "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* The most important factor, however, is the second, centralized control of labor relations. *Schweitzer v. Advanced Telemarketing Corp.,* 104 F.3d 761, 763 (5th Cir.1997). The second circumstance is when "two entities contract with each other for the performance of

some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees." *Lyes,* 166 F.3d at 1341. In this case the two entities are deemed "joint employers." The third circumstance occurs when "an employer delegates sufficient control of some traditional rights over employees to a third party." *Id.* This is known as the "agency" test.

Defendant does not challenge the conclusion that MCCG may be held liable for CareSouth's discriminatory conduct so long as Plaintiff remained its employee, at least up October 31, 1996. Because the relationship between MCCG and Care-South did not change until 1998, when CareSouth was sold to a third party, one would assume that MCCG's liability for CareSouth's violations of Title VII (if any) likewise continued. Nonetheless, Defendant argues that at least for the post-sale period of Plaintiff's claims, the conduct of CareSouth cannot be attributed to MCCG. Accordingly, the Court will review the evidence produced by Plaintiff in support of her contention that MCCG and CareSouth can be considered one entity for purposes of determining Title VII liability during the post-sale period.

The Court notes that because the liberal construction of the term "employer" in Title VII,

> corporate law doctrines may be helpful in our assessment of whether we should treat the defendants as separate corporate entities. However, the most important requirement is that there be sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of the aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.

*Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir.1983).

 Thus, the ultimate inquiry is whether Nealey had a justified belief that MCCG was jointly responsible for the acts

of CareSouth. The Court concludes that under the liberal definition of "employer" in Title VII, Plaintiff has produced sufficient evidence in support of her claim to warrant a jury finding that MCCG and CareSouth were one "employer" throughout the period of her claim, including the following: (1) MCCG and CareSouth remained under the common ownership of CGHS throughout this period; (2) MCCG continued to compete in the home health care business, albeit not in the Thomson Division, following the sale using the CareSouth name (*Banks Dep.* at 53–54); (3) CareSouth was a marketing tool that helped MCCG sell off assets that were outside of its competitive area (*Banks Dep.* at 13–14); and, (4) MCCG had the "primary role" in the CGHS corporate family (*Banks Dep.* at 43 "the Medical Center of Central Georgia is really the primary institution in our health system and is thought of and perceived as such").[10] From these facts, a reasonable jury could conclude that MCCG and CareSouth continued to be a "single employer" after the sale just as it was in the pre-sale period.[11] Thus, if CareSouth is liable to Plaintiff for the discriminatory conduct of its agent, Nelle Ramage, following the sale, MCCG can also be found liable for the conduct of its affiliate.

The more difficult question, however, arises from the relationship of UHS to MCCG/CareSouth. MCCG/CareSouth and UHS cannot be viewed either as a "single employer" or as a "joint employer," but instead, the relationship between them was that of principal (UHS) to agent (MCCG/CareSouth). Indeed, UHS' agreement with CareSouth expressly referred to CareSouth as UHS' agent. (*Plaintiff's Response to Defendant's Statement of Material Facts* ¶ 26 at 31). Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees … and any *agent* of such person." 42 U.S.C. § 2000e(b). This language suggests that an agent of an employer who engages in discriminatory conduct is independently liable for such conduct in addition to the agent's principal. 42 U.S.C. § 2000e-2(a) ("It shall be an unlawful employment practice for an employer …"). A plaintiff then would be able to recover from both the principal, under principles of vicarious liability, and the agent for its own unlawful conduct under § 1981a(a) and (b), since both are statutory "employers" under § 2000e(b).[12]

█ It has long been established that Title VII authorizes recovery only from "employers" and not the employees who

10. Banks also stated, in reply to the question whether it would be accurate to perceive MCCG as the primary management of CGHS, "That's certainly true. The Medical Center employs the vast bulk of the employees and has the vast majority of the budget of Central Georgia Health System." (*Banks Dep.* at 43).

11. A reasonable jury could also conclude that CareSouth was MCCG's "agent" in the business of managing home health care for the period following the sale. The evidence shows that CareSouth was formed exclusively to manage MCCG's home health care operations, and that it did so throughout the period of Plaintiff's suit. *See Spirt v. Teachers Insurance & Annuity Ass'n,* 691 F.2d 1054, 1063 (2nd Cir.1982) (holding that insurance company which existed solely for providing retirement benefits to university employees "are so closely intertwined with those universities … that they must be deemed an "employer" for purposes of Title VII."), *vacated on other*

grounds, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983).

The reluctance of federal courts to allow formalities of state law to determine the outlines of Title VII liability finds support in dicta of the Supreme Court in *City of Los Angeles, Dept. of Water and Power v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657, in which the Court stated that it did not wish to "suggest, of course, that an employer can avoid his responsibilities by delegating discriminatory programs to corporate shells. Title VII applies to 'any agent' of a covered employer …" 435 U.S. at 718 n. 33, 98 S.Ct. at 1380 n. 33.

12. "In an action brought by a complaining party under section 42 U.S.C. § 2000e-5 … against a respondent who engaged in unlawful intentional discrimination …, the complaining party may recover compensatory and punitive damages as allowed in subsection (b)." 42 U.S.C. § 1981a(a)(1).

actually carried out the discrimination. *See, for example, Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) ("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."). A difficulty arises, however, when the employee who discriminated also falls within the literal definition of an "employer" under § 2000e(b).[13] In this circumstance, a literal reading of Title VII would compel the conclusion that both the employer and the discriminating employee/agent can be held liable for the violation of Title VII. The Seventh Circuit, however, in interpreting similar language in the Americans with Disabilities Act, rejected the "plain language" interpretation of "employer" urged on it by the EEOC and refused to allow the plaintiff to sue the sole shareholder of his corporate employer on the theory that he was also an "employer" under the ADA because he was an "agent" of the company that discriminated against the plaintiff. *U.S. Equal Employment Opportunity Commission v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir.1995). That court stated that "the actual reason for the 'and any agent' language in the definition of 'employer' was to ensure that courts would impose respondeat superior liability upon employers for the acts of their agents." *Id.* The Eleventh Circuit has followed the Seventh Circuit's interpretation of the "any agent of such person" language in the ADA, agreeing with that court that this expression "was included [only] to ensure respondeat superior liability of the employer for its agents." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.1996). By implication, this same reasoning would apply to the equivalent language in Title VII's definition of "employer."

In both *AIC Security Investigations* and *Mason*, however, the "agent" whom the plaintiffs wished to sue was a natural person. In contrast to those cases, the "agent" here, CareSouth, is itself an employer whose business was to provide management services to home health care providers such as UHS and MCCG. The *Mason* and *AIC Security Investigations* courts were concerned in the main with ensuring that individuals who were employees could not be held individually liable for violations of Title VII simply because their employment status also qualified them as agents of their employer. Plaintiff is not suing Ramage, however, and, therefore, that concern is absent on these facts. Furthermore, where the agent being sued is itself a company who obtains employer status pursuant to a contractual agreement with the plaintiff's common law employer, policy considerations counsel that it ought to be individually liable for its violations of Title VII. *Cf. Spirt v. Teachers Insurance & Annuity Ass'n*, 691 F.2d 1054 (2nd Cir.1982) (holding that non-affiliated insurance company was an "employer" for Title VII purposes when it existed solely to provide services to employees of other employers). Because of the differences between the facts of this case and that of *Mason*, the Court does not believe that *Mason* determines the viability of Plaintiff's claim against MCCG.

If the Court were to allow Plaintiff to sue MCCG in these circumstances, it might be argued that Plaintiff is in a position to obtain a second recovery for the same injury for which she has already been compensated. Any reading of Title VII that would allow such a double recovery is patently unreasonable and therefore justifies a court's departure from the statute's plain meaning. This problem, however, is more theoretical than real. It poses no dilemma different in kind from that commonly faced by courts in any tort case with multiple defendants, each accused of negligent conduct. In this case, for example, any recovery Plaintiff obtains from MCCG as a result of CareSouth's conduct

---

**13.** This might occur, for example, where the employee charged with the discrimination is an officer of the employer.

after October 31, 1996, would be reduced by the amount Plaintiff recovered from UHS in its settlement, thereby foreclosing the possibility of overcompensation. If Plaintiff's only claim for damages were limited to compensatory damages, then her claim against MCCG for the conduct of Nelle Ramage would already have been satisfied, and there would be no point in further proceedings. In fact, however, Plaintiff also has a claim for punitive damages against MCCG based on the conduct of both Hemphill—dating to the pre-sale period—and Ramage—dating to the post-sale period under § 1981a. Her right to seek punitive damages, therefore, was not foreclosed by her settlement with UHS.

Defendant is not a natural person, but is rather a corporation in the business of providing management services to home health care providers. The Court concludes, therefore, that *Mason* is not on point and that CareSouth, by virtue of its agency relationship with UHS, qualifies as an "employer" under Title VII. Because of the relationship between MCCG and CareSouth, moreover, any unlawful conduct of CareSouth can be attributed to MCCG for purposes of assessing liability under Title VII. Therefore, Plaintiff, assuming she proves her case at trial, can hold MCCG liable for any violations of Title VII committed by CareSouth while she was an employee of UHS. Because Plaintiff has already recovered from UHS, however, any recovery of compensatory damages she obtains from MCCG for those injuries will be reduced by her recovery from UHS. She will also be entitled to seek punitive damages from MCCG based on the conduct of CareSouth in the post-sale period if she proves sufficient facts, including that CareSouth did indeed violate Title VII in the manner alleged in her complaint.

**D.** *Plaintiff's Substantive Claims*

Defendant argues that even if its legal defenses fail, it is nevertheless entitled to summary judgment because Plaintiff has failed to establish a prima facie case of discrimination as required by the *McDon-*

*nell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To make out a prima facie case of intentional discrimination under *McDonnell Douglas,* a plaintiff must show three elements: (1) she is a member of a protected class; (2) she was qualified for the position she held or sought; and (3) she suffered an adverse employment action in regard to that position while persons outside the protected class were not so treated. *Boothe v. Henderson,* 31 F.Supp.2d 988, 996 (S.D.Ga.1998).

"This test, however, is to be applied in cases where circumstantial evidence is the only proof of discrimination. When a plaintiff proves a case of discrimination by direct evidence, application of McDonnell Douglas is inappropriate." *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990) (*citing Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir.1982)). In a direct evidence case, however, the plaintiff must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony. *Id.* If the plaintiff produces such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved. *Id.; Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1787, 104 L.Ed.2d 268 (1989). In other words, the employer must prove that even if it had not taken race into account, it would have come to the same decision. *See Price Waterhouse, Id.* at 241; 109 S.Ct. at 1785.

"Direct evidence is 'evidence, which if believed, proves existence of fact in issue without inference or presumption.'" *Burrell v. The Board of Trustees of Georgia Military College,* 125 F.3d 1390, 1393 (11th Cir.1997), *reh'd denied,* 978 F.2d 718 (11th Cir.1992), *cert. denied,* 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993). The plaintiff in that case was

discharged from her job and she sued her former employer, alleging that her termination was because of her gender. She also claimed that when she expressed her interest in a job as executive vice president about a year prior to her discharge, her supervisor told her that "he wanted to hire a man for the position because too many women filled [the employer's] officer positions." *Id.* The court, however, rejected the plaintiff's attempt to characterize such evidence as "direct" evidence, stating that "the evidence suggests, but does not prove, a discriminatory motive." *Id.* The court noted that the statement at issue "did not specifically address nor were they made in the context of Plaintiff retaining her job"; rather, they were made in the context of her seeking a new job. *Id.* n. 7.

For much the same reason, Defendant claims that despite the evidence of racial hostility, that evidence is unconnected with any *specific* adverse employment decision made by Defendant. *See Damon v. Fleming Supermarkets of Florida,* 196 F.3d 1354, 1358–59 (11th Cir.1999) (proffered evidence is "direct" if it shows "that the complained-of employment decision was motivated by the decision-maker's" unlawful motive), *cert. denied,* —— U.S. ——, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000). This argument is unpersuasive in the circumstances of this case. The Eleventh Circuit carefully distinguished the facts in *Burrell* from the situation in *Alton* where "general racially discriminatory statements made by ... decisionmakers constituted direct evidence of those decisionmakers' failure to promote black employees for discriminatory reasons." *Burrell,* 125 F.3d at 1393 n. 7. The *Burrell* court went further, and stated that

> When employers (like the decisionmakers in *Alton* ), without concern for particulars, make broad, derogatory statements about a gender or a race and, thus, demonstrate a general discriminatory animus toward that protected group, the scope of that evidence can be as broad as the broad statements. These statements—because of their breadth—may obviate the need for in-

ferences about the speaker's motivation for a wide category of employment decisions, including hiring and promoting practices.

*Id.* at 1393–94 n. 7.

■ The alleged statements of Hemphill, the undisputed decisionmaker at the Thomson Division in charge of hiring, salary, promotion, leave and discipline decisions, certainly qualify as the type of broad statements contemplated by the Eleventh Circuit in *Burrell.* Hemphill allegedly referred to African–American employees as "niggers" on repeated occasions; she allegedly expressed a generalized belief in their inability or unwillingness to work; and, she allegedly singled out African–American HHAs for the "opportunity" to clean her home. Bonnie Rocker, a white employee, also testified that African–Americans were expected to be subservient. If the fact-finder were to believe these statements, it would authorize a conclusion, given the breadth of the statements at issue, to conclude that the adverse employment decisions rendered by Hemphill against Plaintiff were a result of her racial animus toward African–Americans. This racial animus could reasonably be seen as having tinged virtually all of Hemphill's decisions regarding Plaintiff, including the salary Hemphill set for Plaintiff; Hemphill's failure to consider Plaintiff for a nursing supervisor position; and Hemphill's decisions to discipline her, deny her leave, and give less regard to her safety than white nurses.

■ Defendant argues that, because Hemphill is also the same decisionmaker that hired Plaintiff, Plaintiff's evidence cannot support a finding that Hemphill's subsequent decisions were racially biased. Evidence that Hemphill hired Plaintiff, however, merely creates a triable issue of fact to be resolved by a jury; it does not insulate Hemphill's subsequent decisions from Title VII review as a matter of law. . *Williams v. Vitro Services Corp.,* 144 F.3d 1438, 1443 (11th Cir.1998) (evidence that same decisionmaker accused of unlawful

bias hired plaintiff gives rise only to permissible inference of non-discrimination, not mandatory inference).

Accordingly, the Court believes that Plaintiff's direct evidence of unlawful discrimination is sufficiently probative to allow her to defeat Defendant's motion for summary judgment. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (*citing Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)).

Assuming for the sake of argument that the statements of Hemphill do not qualify as direct evidence, Plaintiff has certainly met her burden of establishing a prima facie case of discrimination. Defendant argues that some of Plaintiff's claims fail because the conduct challenged by Plaintiff cannot constitute an "adverse employment action." These include Plaintiff's claim that the reprimand she received from Hemphill in April, 1996, for calling a physician directly, her claim that she was deprived of care and protection for her safety, and her claim that she was denied leave for discriminatory reasons. Defendant has pointed the Court to no authority that suggests that discriminatory conduct against a plaintiff whose impact on her terms and conditions of employment are *de minimis* are immune from challenge under Title VII. *Cf. Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir.1986) ("The former Fifth Circuit held in *Swint v. Pullman Standard*, 539 F.2d 77, 89 (5th Cir.1976), that 'a Title VII plaintiff does not have to show economic loss to prove discrimination.' Job titles and duties themselves are conditions of employment protected by Title VII."). Indeed, Congress' passage of the Civil Rights Act of 1991, which for the first time authorized a Title VII plaintiff to recover for non-economic losses, including, *inter alia*, "emotional pain, suffering, inconvenience, mental anguish, ... and other non-pecuniary losses," 42 U.S.C. § 1981a(b), suggests that Congress rejected the notion of a "safe harbor" for *de minimis* intentional discrimination. Defendant's theory contradicts the plain language of Title VII which proscribes discrimination "against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" without any requirement that the violation be significant. 42 U.S.C. § 2000e–2(a)(1).

 Plaintiff has met her burden of production under *McDonnell Douglas* with regard to her claims of discrimination in terms and conditions of employment. Even if the harm she suffered from such conduct was, as Defendant asserts, *de minimis*, that does not negate the fact that an employer's decisions to discipline and grant leave clearly implicate an employee's "terms, conditions, or privileges of employment." Accordingly, if Hemphill, because of Plaintiff's race, preferentially granted leave to white nurses or "reprimanded" (to use Defendant's preferred term) Plaintiff differently than she did white nurses, or was comparatively indifferent to Plaintiff's concerns for her own safety, then a violation of Title VII has potentially occurred.

 As for Plaintiff's differential pay claim, Plaintiff contends that Defendant's legitimate, non-discriminatory reason—that its pay scales are based on length of service, a policy that was taken over from Healthmaster—is insufficient to rebut Plaintiff's prima facie case because Defendant produced no evidence that its decisionmaker, Hemphill, actually relied on this reason when she set Plaintiff's salary.[14] *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 520, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993) (defendant company, in rebutting a plaintiff's prima facie case of intentional discrimination, "must rely upon the statement of an employee ... as to the central fact"); *Walker v. Mortham*, 158 F.3d 1177, 1181–82 n. 8 (11th Cir.1998) (defendant cannot testify as

---

14. Plaintiff's prima facie claim is based on the fact that she was better qualified and had

more experience than many of the white nurses who were getting paid more than she was.

to what might have motivated decisionmaker; it must present specific evidence regarding decisionmaker's actual motivations with regard to each challenged employment decision), *cert. denied*, —— U.S. ——, 120 S.Ct. 39, 145 L.Ed.2d 36 (1999). Accordingly, Plaintiff was not obliged to produce evidence showing pretext, because Defendant has yet to offer a legitimate, non-discriminatory reason for the differences in pay cited by Plaintiff.[15]

■ Likewise, the only reasons given by Hemphill for failing to consider Plaintiff for the open nursing supervisor position were highly subjective, e.g., Plaintiff "did not meet *my* qualifications," *emphasis added,* and that Plaintiff was not "a total team player." (*Hemphill Dep.* at 91, 94); *Chapman v. AI Transport,* 180 F.3d 1244, 1249–50 (11th Cir.1999), *vacated for reconsideration en banc,* (when proffered legitimate, non-discriminatory reason is "highly subjective," defendant faces a higher burden). Furthermore, the informal manner in which Hemphill filled the position (which was itself in violation of MCCG's own policies) gives rise to an inference of intentional discrimination. *Carter v. Three Springs,* 132 F.3d 635, 644 (11th Cir.1998) (deviation from established hiring procedures for benefit of non-minority is evidence of discriminatory intent). Finally, because of the informal manner in which Hemphill filled this position, she was under a "duty to consider all those who might reasonably be interested," and therefore, the fact that Plaintiff never formally applied for the job of nursing supervisor is not relevant to whether she established a prima facie case of discrimination. Instead, all she need do is establish "that [s]he was qualified for the position." *Jones v. Firestone Tire and Rubber Company, Inc.,* 977 F.2d 527, 533 (11th Cir.1992). Defendant does not challenge Plaintiff's objective qualifications for the job of nursing supervisor. In these circumstances,

Plaintiff's prima facie case is sufficient to warrant a jury determination on the merits of her claim.

### E. Punitive Damages

■ The Supreme Court held in *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), that punitive damages under § 1981a(b)(1) requires a finding by the jury that the defendant acted either with "malice or with reckless indifference to [the plaintiff's] federally protected rights." *Id.* at 534, 119 S.Ct. at 2124. Mere egregiousness of the defendant's conduct is not sufficient without a showing that the defendant knew, or was recklessly indifferent to the federally protected rights of his victim. The Supreme Court also held that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good-faith" efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. at 2129. Defendant argues that it is entitled to summary judgment on Plaintiff's claim for punitive damages, based on its good-faith attempts to comply with Title VII.

■ Although Hemphill and Ramage qualify as managerial agents for purposes of establishing the independent liability of the employer, neither of them was sufficiently important in the corporate hierarchy of MCCG to justify a finding that MCCG acted with "malice or with reckless indifference to [the plaintiff's] federally protected rights." What may be probative of MCCG's intent to violate Plaintiff's federally protected rights, however, is the conduct of Ronald Conners, the Chief Executive Officer of CareSouth. Although he pressured Hemphill and Allen to tender their resignations following the September 23, 1996, employees' complaint, Plaintiff

---

**15.** Defendant's argument that, because it inherited its pay scale from Healthmaster, the bankruptcy discharge immunizes it from any discrimination in that pay scale is frivolous. While the bankruptcy discharge certainly immunizes claims of discrimination dating prior to the discharge, it did not give MCCG a license to maintain a discriminatory wage scale inherited from Healthmaster going forward.

has produced evidence that Connors never took the alleged violations of Title VII seriously. (*Rocker Dep.* at 77–79). Similarly, Hemphill testified that when she met with Connors after the September grievance, Connors never asked her about the allegations of racial discrimination raised in the employees' grievance. (*Hemphill Dep.* at 166–67). Thus, a reasonable jury could conclude that CareSouth was "recklessly indifferent" to the federally protected rights of Nealey and other African–American employees of MCCG. A jury could also reasonably conclude that MCCG had not attempted in "good-faith" to comply with Title VII from the fact that it failed to require its managerial personnel such as Hemphill to undergo training in Title VII compliance. (*Id.* at 116).

If a jury were to conclude that Care-South—based on the conduct of Connors—was, in fact, "recklessly indifferent" to Plaintiff's federally protected rights, the Court does not believe that MCCG can easily absolve itself of responsibility for Connors' conduct on the theory that Care-South is merely a "managerial agent" of MCCG. CareSouth was a division of the CGHS corporate family through which MCCG carried out its home health care business. Therefore, Connors' conduct is indicative of MCCG's state of mind. Accordingly, if the jury finds that he had been recklessly indifferent to the federally protected rights of MCCG employees, including Plaintiff, or any of the employees it managed on behalf of UHS, a jury could properly conclude that MCCG possessed the requisite intent to justify an award of punitive damages.

## IV. CONCLUSION

Because none of Defendant's legal defenses has merit, and because Plaintiff has produced direct evidence of discrimination, Defendant's motion for summary judgment is hereby **DENIED**.